FILED
NOVEMBER 27, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUNTER DOUGLAS METALS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| IMASA INDUSTRIA MEXICANA DEL ALUMINIO, S.A. DE C.V. | ) |
| | ) |
| Defendant. | ) |

**07 C 6671**

**JUDGE GUZMAN**
**MAGISTRATE JUDGE MASON**

## COMPLAINT

Plaintiff Hunter Douglas Metals, Inc., by its attorneys, complains of Defendant IMASA Industria Mexicana Del Aluminio, S.A. De C.V. as follows:

### PARTIES

1.  Plaintiff Hunter Douglas Metals, Inc. ("Hunter Douglas" or "Plaintiff") is a Delaware corporation with its principal place of business in Homewood, Illinois.

2.  Defendant IMASA Industria Mexicana Del Aluminio, S.A. De C.V. ("IMASA" or "Defendant") is a Mexican corporation with its principal place of business in Mexico City, Mexico.

### JURISDICTION AND VENUE

3.  Jurisdiction in this matter is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a), because (1) Hunter Douglas is a citizen of Delaware while IMASA is a citizen of Mexico and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claim occurred in the Northern District of Illinois.

5. Further, pursuant to the terms of the Sales Contract that is at the heart of this dispute, IMASA has submitted and agreed to be subject to personal jurisdiction before this Court as the exclusive venue for any suit regarding its contract with Hunter Douglas. (Sales Contract 53555, dated December 12, 2006, Terms and Conditions, ¶ 19; herein referred to as the "Sales Contract".) The Sales Contract is attached as Exhibit 1.

## BACKGROUND FACTS

6. On December 12, 2006, Hunter Douglas and IMASA entered into the Sales Contract, pursuant to which they agreed, among other things, for Hunter Douglas to sell and IMASA to purchase 4,400 metric tons of aluminum scrap in multiple shipments to be delivered to IMASA between February and December of 2007, as further described below.

7. Pursuant to the Sales Contract, the parties agreed that the contract "shall be construed and effected in accordance with the provisions of the Illinois Uniform Commercial Code, and other applicable laws of the State of Illinois, without giving effect to conflict of laws principles." (Ex. 1, ¶ 18.)

8. Pursuant to the Sales Contract, the parties also agreed that the 4,400 metric tons of aluminum scrap would be delivered in shipments of twenty truck loads per month from February through December of 2007. (Ex. 1, "Delivery Period.")

9. The parties agreed that the price of the aluminum would be the average cash settlement price published by the London Metals Exchange ("LME") for High Grade Aluminum discounted by $22.00 per metric ton for the month in which the delivery was made. (Ex. 1,

- 3 -

"Price.") The LME publishes this price to the public each month on its website and in other publicly available sources.

10. The Sales Contract includes the "Terms and Conditions" together with the terms of sale, instructions and other provisions set forth on the face of the Sales Contract. These provisions state the full and complete terms of the parties' agreement. Those terms can only be changed or modified in writing, and only with the agreement of both Hunter Douglas and IMASA. (Ex. 1, Terms and Conditions, ¶ 1.)

11. Hunter Douglas performed under the Sales Contract by delivering scrap aluminum to IMASA on a monthly basis starting in February of 2007. Beginning in February 2007 and continuing into August 2007, Hunter Douglas delivered to IMASA 4,097,737 pounds, or almost 1,859 metric tons, of scrap aluminum. In each instance and in each month of delivery, IMASA accepted the aluminum delivered pursuant to the parties' Sales Contract by picking up the delivery in Laredo, Texas.

12. Upon delivery of each shipment of aluminum, Hunter Douglas billed IMASA, in accordance with the Sales Contract, for each such shipment. IMASA has paid Hunter Douglas $5,127,260 for invoices reflecting shipments delivered through August 15, 2007.

13. In August of 2007, however, IMASA stated that it would not accept any further shipments of the remaining aluminum called for by the Sales Contract. As a reason for its refusal to accept further shipments, IMASA has stated that it now believes the price it agreed to pay under the Sales Contract, and that it paid for aluminum delivered beginning in February 2007 and continuing into August 2007, is too high.

14. Since IMASA announced this position, Hunter Douglas has reaffirmed its intention to continue abiding by the terms of the parties' Sales Contract and has sought IMASA's assurances that it would do the same.

15. Following IMASA's announcement, Hunter Douglas endeavored to find a mutually agreeable way to resolve the issues between them regarding the remaining shipments called for under the parties' contract.

16. IMASA refused to provide Hunter Douglas with any assurance that it will abide by the terms of the parties' Sales Contract for the remainder of the term of the Sales Contract. To the contrary, in mid-August 2007 IMASA stated that it will not accept any further aluminum deliveries from Hunter Douglas. Since that time, Hunter Douglas has made a number of efforts to persuade IMASA to change its position. However, IMASA reiterated its position many times.

## COUNT I – BREACH OF CONTRACT
## (ACTUAL BREACH AND ANTICIPATORY REPUDIATION)

17. Hunter Douglas restates Paragraphs 1 through 16 of this Complaint as Paragraph 17 of Count I.

18. By communicating its intention not to abide by the terms of the parties' Sales Contract, IMASA announced its intention to breach the Sales Contract.

19. By announcing its refusal to accept deliveries of aluminum after the shipments made on or about August 15, 2007, IMASA has committed an actual breach of the Sales Contract with respect to shipments of aluminum that otherwise would have been made pursuant to the terms of the Sales Contract up to the date of this Complaint.

20. By announcing its intention not to abide by the terms of the parties' Sales Contract, IMASA has anticipatorily repudiated the Sales Contract with respect to shipments of aluminum that otherwise would have been made from and after the date of this Complaint

21. As a result of its wrongful actual breach and anticipatory repudiation of the Sales Contract, IMASA is now liable for the balance of the payments due to Hunter Douglas under the Sales Contract.

22. Having received approximately 1,859 metric tons thus far, the balance of the parties' Sales Contract consists of approximately 2,541 metric tons of aluminum scrap.

23. The price for the balance of the aluminum called for by the Sales Contract is the average settlement price on the London Metals Exchange for High Grade Aluminum in each of September, October, November, and December of 2007 discounted by $22.00 per metric ton. Based on prevailing market conditions during the term to date of the Sales Contract, IMASA's actual breach and anticipatory repudiation of the Sales Contract has caused Hunter Douglas damages in excess of $800,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hunter Douglas Metals, Inc. prays that the Court enter judgment in its favor and against Defendant IMASA Industria Mexicana Del Aluminio, S.A. De C.V., and enter an order awarding the following damages:

    A. For compensatory, incidental, and/or consequential damages resulting from IMASA's actual breach and anticipatory repudiation of the Sales Contract;

    B. For pre-judgment interest at the rate of 1.5% above prime, as called for by the Sales Contract; and

    C. For such further and additional relief to which Hunter Douglas may be entitled under the Sales Contract and applicable law.

HUNTER DOUGLAS METALS, INC.

By: _____
One of Its Attorneys

Jeffrey T. Gilbert
Max A. Stein
REED SMITH LLP
10 S. Wacker Drive
Suite 4000
Chicago, IL  60606
(312) 207-1000

2106131

- 6 -

Case 1:07-cv-06671    Document 1    Filed 11/27/2007    Page 7 of 10

# EXHIBIT 1

# Hunter Douglas Metals, Inc.
915 W 175th Street
Homewood, IL 60430
TEL 708 799-0800 FAX 708 799-2787

**Sales Contract:   53555**

Date:             December 12, 2006
Your Number:

Sold To:

| |
|---|
| IMASA-Ind. Mexicana Del Alum. SA de CV<br>Benjamin Franklin No. 9<br>Conjunto Industrial La Joya<br>C.P. 54730, Cuautitlan Izcalli<br>Estado de Mexico, Mexico |

Delivery: FOB Delivered
        IMASA's Customs Broker
        Laredo, TX
Mode of Shipment: Truck
Payment Terms: 100% Net 30 Days From
        Arrival
Delivery Period: 20 T/L per month Feb- Dec 2007

We confirm to have sold to you and you agree to have purchased from us the following material subject to all the terms and conditions on this page and on the reverse side, all of which are and shall be part of the agreement.

Buyer's Representative: Through Prutrade        HDM Representative: George Ribet

| ITEM | QUANTITY | UOM | COMMODITY DESCRIPTION | PRICE |
|---|---|---|---|---|
| 1 | 4,400 | Metric tons | 1100 Alloy Aluminum Finstock Scrap In Bales or Briquettes and/or 1100 Alloy Clips. | See Below |

OTHER INFORMATION OR TERMS

Price: Average LME HG Aluminum Cash Settlement for the Contractual
    Month of Delivery less a Discount of $22.00/MT

Weight approximate

IMPORTANT:   Any material under this order which is on a shipping point basis must be scheduled / released through our traffic department (TEL 708-799-0800 / FAX 708-799-3584).

PLEASE SIGN AND RETURN ONE COPY        HUNTER DOUGLAS METALS, INC.

ACCEPTED _____        BY _____
                                          Business Partner
                                          Page 1 of 1

## SALES CONTRACT TERMS AND CONDITIONS

1. **Force of Conditions.** The following terms and conditions, together with the instructions and provisions on the reverse side hereof, as well as any rider which Seller may attach hereto shall be the only provisions of this order. No changes or modifications herein shall be effective unless the same be in writing, signed by duly authorized representatives of Seller and Buyer.

2. **Provisions Hereof Prevail.** Buyer expressly waives all provisions contained in any of Buyer's forms (whether acknowledgement, acceptance or otherwise) involved in this sale which in any manner negate, limit, extend or conflict with the provisions herein and agrees that the provisions hereof shall at all times prevail in preference to the provisions of any such form.

3. **Shipment.** Regardless of which party shall be obligated to pay for freight and/or cost incident to shipment pursuant to the provisions on the reverse side hereof, the parties expressly understand and agree that delivery to a common carrier, licensed trucker, vessel or other means of transportation shall constitute delivery to Buyer, and all loss or damage and other incidents of ownership shall thereupon pass to Buyer provided that Seller shall remain a security interest in the material sold hereunder ("material") until the purchase price is paid in full. Buyer hereby agrees, upon being requested so to do by Seller, to execute and deliver to Seller any and all documents reasonably required by Seller to perfect its security interest in the material. Unless otherwise specifically provided on the reverse side hereof, Seller shall designate method, route and carrier or carriers to be utilized for this shipment and delivery of the material. Dates of delivery are approximate and are not a guarantee of a particular day or date of delivery. Notwithstanding the foregoing, any and all shipping, freight, demurrage or storage costs and charges and/or warehouse costs incurred by reason of Buyer's failure to accept timely delivery of the material (which shall include the failure of any party to whom delivery is to be made pursuant to Buyer's direction as indicated on the reverse side hereof) shall be borne solely by Buyer.

4. **Price - Payment.** A. Prices as shown on reverse side hereof are as agreed upon but when any price is not so stated, it is agreed that the material shall be billed at the price last quoted to Buyer, in writing, if any, or the prevailing market price at the time of shipment, whichever is higher. Payment shall be made in United Sates currency and shall be made directly to Seller unless otherwise specifically provided on the reverse side hereof.
B. Unless otherwise specifically provided on the reverse side hereof, terms of payment shall be net 30 days provided that Seller shall have the continuing right to approve Buyer's credit and if at any time prior to the commencement or the completion of shipment of the material Seller, for reasonable cause, becomes dissatisfied with Buyer's credit, Seller may at any time thereafter require payment, in whole or in part, in advance of any shipment or the completion of any shipment hereunder, satisfactory security or a guarantee of prompt payment. If Buyer should refuse to make such payment or furnish such security or guarantee as demanded, Seller may terminate this agreement, refuse to deliver the material or any undelivered portion thereof and Buyer shall immediately become liable to Seller for the unpaid purchase price of all of the material delivered and for damages as provided in paragraph 15 below. Overdue invoices shall bear interest at the rate of prime plus 1 1/2 % (as charged from time to time by the ABN Amro Bank N.V. -Chicago). Buyer's payments on overdue invoices shall be applied first against accrued interest and thereafter on account of unpaid invoices in chronological order. Buyer agrees to pay Seller's costs of collection of overdue invoices, including reasonable attorney's fees.

5. **Import - Export.** A. As to all material imported into the United States by Seller for sale hereunder, unless otherwise specifically provided on the reverse side hereof, any and all import duties, import licenses and customs clearance required, levied or charged by the United States in connection with such importation shall be paid for and/or procured by Seller.
B. As to all materials exported from the United States by Seller for sale hereunder, unless otherwise specifically provided on the reverse side hereof:
(i) any and all import duties, import licenses and customs clearance required, levied or charged by the country of destination in connection with such material shall be paid for and/or procured by Buyer.
and
C. As to all material which is being exported by Seller from any country (export country) other than the United States to any other country (import country) other than the United States for sale hereunder, unless otherwise specifically provided on the reverse side hereof:
(i) any and all export duties, export licenses and customs clearance required, levied or charged by the export country in connection with such exportation shall be paid for and/or procured by Seller.
(ii) any and all import duties, import licenses and customs clearance required, levied or charged by the import country in connection with such importation shall be paid for and/or procured by Buyer.

6. **Taxes.** Subject to the provisions of paragraph 5 hereof, Buyer shall pay and be liable for all federal, state and local sales, excise, use or privilege taxes and any and all foreign governmental taxes and/or assessments and import duties payable in connection with this transaction.

7. **Warranties.** THE WARRANTIES OR REPRESENTATIONS, IF ANY, EXPRESSED ON THE REVERSE SIDE HEREOF ARE IN LIEU OF ANY OTHER WARRANTIES, OR REPRESENTATIONS, EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ARE IN LIEU OF ANY AND ALL OTHER OBLIGATIONS OR LIABILITY ON SELLER'S PART. Under no circumstances will Seller be liable for any incidental or consequential damages of for any other loss, damage or expense of any kind, including loss of profits, arising in connection with this contract or with the use of or inability to use the material furnished under this contract. Seller's maximum liability shall not exceed and Buyer's remedy is limited to either:
1. Replacement of non-conforming material, or at Seller's option;
2. Return of non-conforming material (subject to the provisions of this paragraph 7) and refund of the purchase price; and such remedy shall be Buyer's entire and exclusive remedy. No claim of any kind or nature whatsoever for delivery or non-delivery of material shall be made or be enforceable against Seller unless Buyer shall give Seller written notice thereof with full complete details, within 10 days after arrival of the material at its destination specified on the reverse side hereof. In any event, Seller's liability shall be limited solely in accordance with the provisions of paragraph 7 hereof. In no event shall any material be returned to Seller unless and until Seller has had an opportunity to inspect the material in question and Seller authorizes, in writing the return of the material.

8. **Quantities.** The specific quantity of each type of material sold hereunder will be delivered and Buyer shall not have the right to change the quantity of material or any type of material purchased hereunder without Seller's prior written consent. Notwithstanding anything herein to the contrary:
A. If the quantity stated on the reverse side hereof for any material refers to "about" or "approximately", delivery by Seller of quantities of that material may vary 10%, more or less, from the stated quantity of that material and such a variation shall be permissible and shall not constitute a breach hereof;
B. Unless otherwise specified, a ton shall be understood to be two thousand (2000) pounds: a gross ton, two thousand two hundred forty (2240) pounds, and a metric ton, two thousand two hundred four point six (2204.6) pounds.
If there is a variation in the quantity of material sold hereunder pursuant to the foregoing clause A, the purchase price for the material sold hereunder shall be computed on the basis of the quantity of the material actually delivered, using the per unit price for the material applicable hereunder.

9. **Cancellation.** Seller reserves the right to cancel all or any part of the undelivered or uncompleted portion of the sale contemplated hereby without liability on its part and without prejudice to any claim Seller may have against Buyer if:
1. Buyer fails for any reason to take delivery of any material within the time specified; or
2. Buyer ceases to do business, becomes insolvent, makes an assignment for the benefit of creditors or institutes or has instituted against it any proceeding for the appointment of a receiver or trustee under the federal or any state bankruptcy act or files or has filed against it any proceeding under the federal or any state bankruptcy act alleging that Buyer is insolvent and such proceeding is not dismissed within 30 days of the date of filing thereof.

10. **Force Majeure.** Seller shall not be liable for failure to perform hereunder if such failure is the result of acts of God or of the public enemy, fire, floods, epidemics, quarantine restrictions, power or fuel shortages or interruptions of a material nature strikes (whether or not it is within the power and control of Seller to resolve or concede the cause of the strikes), labor difficulties or shortages, slowdowns, shortages of material, freight embargoes, unusually severe weather, failure of usual means of supply or transportation; war (declared or undeclared), insurrection, riots, allocations or limitations or other acts required by federal, state or local governments or any of their subdivisions, bureaus or agencies thereof or any foreign government or any subdivisions, bureaus or agencies thereof. Seller may, at its option, cancel this agreement or delay performance hereunder for any period reasonably necessary by reason of any of the foregoing during which time this agreement shall remain in full force and effect unless so cancelled by Seller.

11. **Use of Seller's Name.** Buyer further covenants and agrees that it will not, without the prior written consent of Seller, advertise or publish the fact that it has contracted to purchase the material from Seller.

12. **Seller's Property.** All equipment, tractors, trailers and tote boxes (equipment) furnished by Seller to Buyer in connection with the performance hereof shall remain the sole and exclusive property of Seller, and shall be promptly returned to Seller, at Buyer's expense, upon completion of this sales contract or at such earlier time as Seller may request. Any and all such equipment shall be returned at Buyer's expense to Seller at such location as shall be designated by Seller. Unless otherwise agreed, Buyer, at its sole expense, shall insure all such items with a reputable company for the full insurable value thereof against loss or damage of any kind. Upon request, Buyer agrees to furnish a certificate of such insurance satisfactory to Seller.

13. **Assignment.** Buyer shall not assign or transfer this contract or any interest therein or monies payable thereunder, without the prior express written consent of the Seller; and purported assignment made without such consent shall be null and void.

14. **Default.** If Buyer default hereunder, Buyer shall be liable for all of Seller's damages sustained by reason thereof, including loss of reasonable profits caused by Buyer's default hereunder, and in the event of any such default, Seller shall have all rights and remedies available to it in law and in equity, including all rights and remedies granted to the holder of a security interest under the Uniform Commercial Code, and Seller may pursue any and all rights and remedies available to it either simultaneously or otherwise without thereby electing any such right or remedy to the exclusion of others.

15. **No Waiver.** Neither party shall be deemed to have waived any right, power or privilege hereunder unless such waiver shall have been duly executed in writing. The failure of either party to enforce at any time any of the provisions hereof shall in no way be construed to be a waiver of such provisions, or any other provisions hereunder. No waiver of any breach hereunder shall be held to be a waiver of any other or subsequent breach.

16. **Paragraph Headings.** Paragraph headings used herein are for convenience only and shall have no substantive effect upon this agreement and shall not be construed as an addition to or limitation of any provision hereof.

17. **Binding Contract.** In accordance with the custom and practice of the metals trading industry and, if applicable, the course of dealing between Buyer and Seller, this order shall constitute a binding and valid contract between the parties whether or not Buyer countersigns this contract in the space provided and returns it to Seller; and shall be enforceable in accordance with it's terms. Seller may also send to Buyer confirmation copies of this contract by fax or other electronic transmission, and such form of communication shall constitute delivery of this contract to Buyer and confirmation of the terms and conditions agreed between Buyer and Seller.

18. **Applicable Law.** This contract shall be construed and effected in accordance with the provisions of the Illinois Uniform Commercial Code, and other applicable laws of the State of Illinois, without giving effect to conflict of laws principles, all of which shall govern all matters in relation to this order except to the extent any provisions hereof conflict therewith, in which case the provisions hereof shall control.

19. **Jurisdiction.** Buyer hereby submits to and agrees that it shall be subject to personal jurisdiction in the United States District Court for the Northern District of Illinois, Eastern Division (or if such court does not have or refuses jurisdiction, any appropriate court of original jurisdiction of the State of Illinois sitting in Chicago, Illinois) for any lawsuit brought by Seller with respect to this order and agrees that personal service of process may be made upon it by registered mail or by any reputable air courier service (such as, but not limited to, Federal Express). Said court shall be the exclusive venue for any suit by Buyer against Seller.